HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division
JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division
ROBERT J. KEENAN (CA No. 151094)
Senior Counsel
Civil Rights Division
MATTHEW J. DONNELLY (IL No. 6281308)
Attorney
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, D.C.  20530
    Telephone: (202) 616-2788
    E-Mail:    matthew.donnelly@usdoj.gov

BILAL A. ESSAYLI
Acting United States Attorney
RICHARD M. PARK
Chief, Civil Rights Section
Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
    United States Attorney's Office
    300 North Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone: (213) 894-2464
    E-Mail:    julie.hamill@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>        v.<br><br>CALIFORNIA INTERSCHOLASTIC FEDERATION, et al.,<br><br>               Defendants. | Case No.   8:25-cv-01485-CV-JDE<br><br>**UNITED STATES' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS COMPLAINT**<br><br>Date:        October 24, 2025<br>Time:       1:30 p.m.<br>Courtroom:  10B<br><br>Honorable Cynthia Valenzuela<br>United States District Judge |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................. ii

I.    INTRODUCTION ..................................................................................... 1

II.   ARGUMENT ............................................................................................ 2

    A.    Title IX Prohibits California's Discriminatory Gender Identity Policy
        That Permits Some Boys to Participate in Sports Designated for Girls. ...... 2

        1.    Title IX Prohibits Discrimination on the Basis Of "Sex" Not
            "Gender Identity." .................................................................... 3

        2.    The Biological Differences Between the Sexes Provide the
            Non-discriminatory Justification for Sex-Separated Sports. ............. 6

        3.    California's Gender Identity Policy Violates Title IX by
            Harming Girls and Their Equal Opportunities. ............................. 10

        4.    The Athletics Regulation Further Confirms California's
            Gender Identity Policy Violates Title IX and Girls' Equal
            Opportunities.......................................................................... 13

    B.    California's Attempts to Sidestep Title IX Fail. .......................................... 15

        1.    California's Cases are Inapposite in this Context of Title IX
            and Sex-Separated Sports. ........................................................ 15

        2.    California's Proposed Application of the Policy Interpretation
            of the Regulation Conflicts with Title IX. ................................... 19

        3.    California's had Clear Notice that Title IX Prohibits
            Discrimination Based on Sex, not Gender Identity. ......................... 21

III.  CONCLUSION......................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases:**

*Abramski v. United States*,
    573 U.S. 169 (2014)...............................................................................13

*Adams v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022).......................................................*passim*

*Ala. Dep't of Revenue v. CSX Transp., Inc.*,
    575 U.S. 21 (2015).....................................................................................7

*Alabama v. U.S. Sec'y of Educ.*,
    2024 WL 3981994 (11th Cir. Aug. 22, 2024) ................................6, 17

*Ames v. Ohio Dep't of Youth Servs.*,
    605 U.S. 303 (2025)................................................................................20

*Arkansas v. Dep't of Educ.*,
    742 F. Supp. 3d 919 (E.D. Mo. 2024) .................................................22

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006).................................................................................21

*Bauer v. Lynch*,
    812 F.3d 340 (4th Cir. 2016) ...................................................................9

*Bostock v. Clayton County*,
    590 U.S. 644 (2020).....................................................................15, 16, 17

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
    190 F.3d 705 (6th Cir. 1999) ....................................................................9

*Cape v. Tenn. Secondary Sch. Athletic Ass'n*,
    563 F.2d 793 (6th Cir. 1977) ....................................................................9

*Chevron U.S.A. v. Natural Res. Def. Council*,
    467 U.S. 837 (1984)................................................................................19

*Clark v. Arizona Interscholastic Ass'n ("Clark I")*,
    695 F.2d 1126 (9th Cir. 1982) ..................................................................9

**Cases (continued):**

*Clark v. Arizona Interscholastic Ass'n ("Clark II")*,
    886 F.2d 1191 (9th Cir. 1989) ..................................................................10, 13

*Craig v. Boren*,
    429 U.S. 190 (1976)............................................................................... 8-9

*Dep't of Educ. v. Louisiana*,
    603 U.S. 866 (2024)...............................................................................6, 22

*DHS v. MacLean*,
    574 U.S. 383 (2015)....................................................................................6

*Doe v. Horne*,
    115 F.4th 1083 (9th Cir. 2024) .............................................................18, 24

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022) .................................................................17, 23

*Doe 2 v. Shanahan*,
    917 F.3d 694 (D.C. Cir. 2019)....................................................................12

*Folwell v. Kadel*,
    145 S. Ct. 2838 (2025)..............................................................................17

*Grabowski v. Ariz. Bd. of Regents*,
    69 F.4th 1110 (9th Cir. 2023) ....................................................................17

*Grove City Coll. v. Bell*,
    465 U.S. 555 (1984).........................................................................5, 14, 21

*New Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982)...........................................................................1, 4, 5

*Heckler v. Chaney*,
    470 U.S. 821 (1985)..................................................................................25

*Hecox v. Little*,
    104 F.4th 1061 (9th Cir. 2024) .........................................................18, 19, 24

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)..............................................................................7, 12

1

**Cases (continued):**

*Lange v. Houston Cnty.*,
  --- F.4th ----, No. 22-13626, 2025 WL 2602633
  (11th Cir. Sept. 9, 2025) (en banc) ................................................. 17

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .......................................................... 5, 14, 20, 21

*Louisiana v. Dep't of Educ.*,
  No. 24-30399, 2024 WL 3452887
  (5th Cir. July 17, 2024) ........................................................... 22

*Louisiana v. U.S. Dep't of Educ.*,
  737 F. Supp. 3d 377 (W.D. La. 2024) .................................... 13

*Mansourian v. Regents of Univ. of California*,
  602 F.3d 957 (9th Cir. 2010) ........................................... 1, 19

*McCormick v. School Dist. of Mamaroneck*,
  370 F.3d 275 (2d Cir. 2004) ................................... 1, 4, 13, 14

*Michael M. v. Superior Court of Sonoma County*,
  450 U.S. 464 (1981) ................................................................. 8, 9

*O'Connor v. Bd. of Educ. of Sch. Dist. 23*,
  449 U.S. 1301 (1980) ................................................................. 10

*Oklahoma v. Cardona*,
  743 F. Supp. 3d 1314 (W.D. Okla. 2024) ............................... 22

*Parents for Priv. v. Barr*,
  949 F.3d 1210 (9th Cir. 2020) ................................................ 24

*Roe v. Critchfield*,
  137 F.4th 912 (9th Cir. 2025) ................................... 3, 21, 24-25

*Sandifer v. United States Steel Corp.*,
  571 U.S. 220 (2014) ................................................................... 3

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Cases (continued):**

*Tennessee v. Cardona*,
    2024 WL 3453880 (6th Cir. July 17, 2024) ............................................6, 17, 22

*Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ...........................................................................14

*Tuan Anh Nguyen v. I.N.S.*,
    533 U.S. 53 (2001).................................................................................................8

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025)..............................................................8, 11, 16-17, 19

*United States v. Virginia*,
    518 U.S. 515 (1996)....................................................................................8-9, 24

*Weinberger v. Wiesenfeld*,
    420 U.S. 636 (1975)...............................................................................................9

*Whirlpool Corp. v. Marshall*,
    445 U.S. 1 (1980)..................................................................................................7

**Statutes:**

Education Amendments of 1974, Pub. L. No. 93-380,
    § 844, 88 Stat. 484, 612 (1974) ........................................................................5, 14

10 U.S.C. § 7442...................................................................................................9

18 U.S.C. § 249....................................................................................................6

20 U.S.C. § 1681 ............................................................................................ 1, 3-4

20 U.S.C. § 1686...........................................................................................4, 7, 16

34 U.S.C. § 30501...............................................................................................5

34 U.S.C. § 30503...............................................................................................6

**Statutes (continued):**

Pub. L. No. 94-106, Title VIII, §  803(a),
    89 Stat. 531, 537 (Oct. 7, 1975)..........................................................................9

**Regulations:**

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025)........................................23

Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 11, 2025)...........................15, 23, 25

34 C.F.R. 75.700 ......................................................................................................22

34 C.F.R. 106.4 ........................................................................................................22

34 C.F.R. § 106.32 .....................................................................................................5

34 C.F.R. § 106.33 .....................................................................................................5

34 C.F.R. § 106.41 ................................................................... 5, 10, 13-14, 20

34 C.F.R. § 106.43 .....................................................................................................5

40 Fed. Reg. 24,128 (June 4, 1975) .........................................................................5

85 Fed. Reg. 30,026 (May 19, 2020) ......................................................................25

1    **I.    INTRODUCTION**

2        California forces girls to play school sports on an uneven playing field.  Girls must

3    compete against boys who possess inherent physical advantages over them.  Because

4    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, precludes this

5    practice by its plain text, the United States filed this suit to protect California's girls from

6    this reprehensible unfairness.

7        Title IX is "widely recognized as the source of a vast expansion of athletic

8    opportunities for women in the nation's schools and universities." *Mansourian v.*

9    *Regents of Univ. of California*, 602 F.3d 957, 961 (9th Cir. 2010).  The statute "was

10    enacted in response to evidence of pervasive discrimination against women with respect

11    to educational opportunities."  *McCormick v. School Dist. of Mamaroneck*, 370 F.3d

12    275, 286 (2d Cir. 2004); *see also N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523 n.13

13    (1982).  Among other accomplishments, the statute has triggered "a virtual revolution for

14    girls and women in sports" since its passage.  *Adams v. Sch. Bd. of St. Johns Cnty.*, 57

15    F.4th 791, 818 (11th Cir. 2022) (en banc) (Lagoa, J., concurring) (citation omitted).

16        Defendants' discriminatory "gender identity policy"[1] winds back this historic

17    progress.  This unjustifiable policy of Defendants California Department of Education

18    ("CDE") and California Interscholastic Federation ("CIF") (collectively "California"),

19    throws out biology and forces girls to compete against boys with inherent physical

20    advantages, and allow boys onto their locker rooms, so long as those boys subjectively

21    identify themselves as girls.

22        The United States' Complaint alleges California's gender identity policy harms

23    girl athletes and violates Title IX.  *See generally* Compl. ECF No. 1.  The Complaint

24    describes how the policy facially discriminates against girls, *id.* ¶¶ 45-55, and how

25    California has implicitly acknowledged as much, *id.* ¶¶ 56-64.  The Complaint further

26

27        [1] *See*, *e.g.*, Compl. ¶¶ 52 (CIF Bylaw 300.D), 46 (California Sex Equity in
28    Education Act, Cal. Educ. Code § 221.5(f)) (collectively "gender identity policy").

1

alleges specific examples of harm to girls, *id.* ¶¶ 65-89, and California's repeated failure to listen to girls' objections to this harmful discriminatory policy, *id.* ¶¶ 90-97.

California filed a Motion to Dismiss, ECF No. 25.  In its Motion, California primarily argues that Title IX extends to gender identity, that the United States has failed to allege a traditional Title IX claim under a Policy Interpretation of the athletics regulation, and that California lacked clear notice it was violating Title IX under the Spending Clause.  *See* Defs' Br., ECF No. 25-1.

This Court should deny California's Motion.  Title IX prohibits discrimination on the basis of sex—not gender identity.  California's gender identity policy is untethered from the very justification for sex-separate sports under Title IX:  innate biological differences between males and females that make competition between them inherently unfair.  The policy accordingly violates both the underlying biological justification for separating sports and Title IX's overriding command that the sex-separation in athletics cannot disadvantage either sex.

California's attempts to sidestep Title IX's requirements fail.  It cites inapposite case law that does not deal with Title IX and sports, and relies on a Policy Interpretation that is inapplicable to its gender identity policy because that policy fails to separate by sex in the first place.  As for notice that its actions violate Title IX, California had plenty; Title IX's text, its implementing regulations, relevant case law, and Executive Orders provided California with all the notice that precedent requires.

## II.    ARGUMENT

### A.    Title IX Prohibits California's Discriminatory Gender Identity Policy That Permits Some Boys to Participate in Sports Designated for Girls.

Title IX prohibits discrimination on the basis of "sex," and does not mention or encompass California's preferred "gender identity" classification.  Biological "sex" is the only justifiable reason educational programs can separate sports in the first place.  Title IX's prohibition of sex discrimination permits educational programs to separate competitive sports by sex *only* because the biological differences between the sexes

2

naturally give males an unfair advantage.  Because of this male advantage, the sexes are not similarly situated in athletics, and separating sports teams by sex is not prohibited "discrimination" when such separation does not treat either sex worse than the other.

In comparison, California's gender identity policy violates Title IX because it treats females worse than males.  The policy violates both the underlying biological justification for separating sports and Title IX's overriding command that the sex-separation in athletics cannot disadvantage either sex.  Contrary to Title IX, the policy jettisons biology as its justification for separation and causes an imbalanced, unfair disadvantage to female athletes.

1.    <u>Title IX Prohibits Discrimination on the Basis Of "Sex" Not "Gender Identity."</u>

Title IX prohibits discrimination on the basis of "sex" according to that term's plain biological and binary (male/female) meaning.  Despite California's urging (at 3) that Title IX's reference to "sex" encompasses "gender identity and gender expression," California's expansive definition conflicts with the statutory text and history of Title IX.

a.    *Text*

Title IX requires that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Because the statute does not define "sex," the term should "be interpreted as taking [its] ordinary, contemporary, common meaning." *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted).  When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what the term has always meant:  biological sex.  *See, e.g.*, *Roe v. Critchfield*, 137 F.4th 912, 929 (9th Cir. 2025) ("[F]rom the time of the enactment of Title IX and its implementing regulations, the scheme has authorized schools to maintain sex-segregated facilities, and *contemporary dictionary definitions commonly defined "sex" in terms that refer to students' sex assigned at birth*." (emphasis added)); *Adams v. Sch. Bd. Of St.*

3

*Johns County*, 57 F.4th 791, 812-13 (11th Cir. 2022) (en banc) (consulting nine contemporary dictionaries for definitions); *see also* 57 F.4th at 812-15 (finding Title IX refers to biological sex).  And Title IX's statutory text uses the term consistent with biological sex, referring to a binary classification based on biological differences.  For instance, right after the general prohibition in 20 U.S.C. § 1681(a), the statute expressly provides that this "section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of the *other sex*."  20 U.S.C. § 1681(a)(8) (emphasis added).  Similarly, the statute provides a grace period for an "institution which admits only students of *one sex* to being an institution which admits students of *both sexes*."  *Id.* § 1681(a)(2) (emphasis added).  Title IX elsewhere also clarifies that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."  *Id.* § 1686.  These provisions could not sensibly function if the term "sex" includes "gender identity," which, unlike "sex," is a spectrum and may not be limited to two categories.

*b.*   *Title IX's Historical Context*

Historical context further confirms that Congress used the word "sex" in its ordinary biological sense and that Congress's bar on sex discrimination still allowed separating biological males and females in sports.  "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities, which was documented in hearings held in 1970 by the House Special Subcommittee on Education."  *McCormick*, 370 F.3d at 286; *see also N. Haven Bd. of Ed.*, 456 U.S. at 523 n.13.  Against that backdrop, members of Congress voting on Title IX and any politically engaged citizen would have understood the statute as directed at eliminating discrimination in education based on biological sex—*i.e.*, unequal treatment of males and females—consistent with the term's ordinary meaning.

4

Contemporaneous post-enactment history confirms Title IX refers to biological sex and does not include discrimination based on "gender identity." Shortly after enacting Title IX in 1972, Congress passed the Javits Amendment that directed the Education Department's predecessor to create regulations "implementing . . . [T]itle IX," which "shall include" regulations on "athletic activities." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including sports. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[2] Those "roughly contemporaneous[]" regulations "have remained consistent over time" and are thus "especially useful in determining the statute's meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 370, 394 (2024). Moreover, that evidence is particularly strong here because Congress got the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ.*, 456 U.S. at 530-35.

Congress's actions in the more than 50 years following Title IX's enactment further confirm that "sex" in this statute does not encompass "gender identity." In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate from sex discrimination. *E.g.*, 34 U.S.C. § 30501(1) (amended in 2009) ("[I]ncidence of violence motivated by the actual or perceived race, . . . *gender, sexual orientation, gender identity*, or disability of the victim

---

[2] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."). These contemporaneous, and longstanding agency interpretations also confirm that Title IX refers to biological sex.

poses a serious national problem" (emphasis added)); 18 U.S.C. § 249(a)(2)(A) & (c)(4)
(2009) (prohibiting acts or attempts to cause bodily injury to any person "because of the
actual or perceived religion, national origin, *gender, sexual orientation, gender identity,*
or disability of any person" (emphasis added)); 34 U.S.C. § 30503(a)(1)(C) (regarding
federal assistance to state, local, or tribal investigations of crimes "motivated by
prejudice based on the actual or perceived race, . . . *gender, sexual orientation, gender
identity,* or disability of the victim" (emphasis added)); *id.* § 12291(b)(13)(A) (amended
in 2013) (prohibiting discrimination in certain federally funded programs "on the basis
of actual or perceived race, . . . *sex, gender identity* . . . , *sexual orientation,* or disability"
(emphases added)).  These post-Title IX enactments illustrate that Congress knows how
to prohibit discrimination based on "gender identity" when it wishes to do so.  *DHS v.
MacLean*, 574 U.S. 383, 394 (2015).  But Congress did not do so for Title IX.

　　　　Finally, multiple courts have confirmed that Title IX allows separating the sexes
and that Title IX does not include discrimination based on "gender identity."  *See, e.g.*,
*Tennessee v. Cardona*, 2024 WL 3453880, at *2-3 (6th Cir. July 17, 2024); *Alabama v.
U.S. Sec'y of Educ.*, 2024 WL 3981994, at *4-5 (11th Cir. Aug. 22, 2024) (collecting
cases).  Moreover, the Supreme Court, in denying a stay of orders invalidating a Title IX
rule that tried to change Title IX to include gender identity, confirmed that "all Members
of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief
as to . . . the central provision that newly defines sex discrimination to include
discrimination on the basis of sexual orientation and *gender identity*."  *Dep't of Educ. v.
Louisiana*, 603 U.S. 866, 867 (2024) (emphasis added).

　　　　This Court should accordingly reject California's request to extend Title IX
beyond its plain meaning of biological "sex."

　　　　　　2.　　The Biological Differences Between the Sexes Provide the Non-
　　　　　　　　　discriminatory Justification for Sex-Separated Sports.

　　　　Title IX permits educational programs to separate competitive sports by sex only
because the biological differences between the sexes naturally give males an unfair

advantage in sports. Because of this male advantage, the sexes are not similarly situated in athletics, and separating sports teams by sex is not "discrimination" prohibited under Title IX when such separation does not treat members of either sex worse than the other.

Title IX carries "the 'normal definition of discrimination.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (citation omitted). And the "ordinary meaning of the word 'discrimination'" is treating individuals or groups that "are similarly situated differently without sufficient justification for the difference in treatment." *Ala. Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015) (quotation marks omitted); *see, e.g.*, *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 19 (1980) ("An employer 'discriminates' against an employee only when he treats that employee less favorably than he treats others similarly situated."). Title IX thus prohibits practices that subject members of one biological sex to less favorable treatment than similarly situated members of the other sex. *Jackson*, 544 U.S. at 174 (citation omitted).

Because the two sexes are usually similarly situated when it comes to educational programs, Title IX usually prohibits sex separation. For example, the statute prohibits separate male and female math classes because for classes they are similarly situated; biological sex is irrelevant. Biological sex, however, is highly relevant to athletics.

Separating sports by sex is not "discrimination" prohibited by Title IX because it treats similarly situated individuals equally by distinguishing the sexes based on relevant biological differences. Title IX itself explicitly recognizes that when biology is relevant, sex-separation is not discrimination. Congress clarified that Title IX's general bar on sex discrimination must not "be *construed* to prohibit any" federal-funding recipient "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686 (emphasis added). This "[i]nterpretation," *id.*, of Title IX's general sex-discrimination bar confirms that Title IX does not prohibit sex separation when based on real differences rooted in biology. It also shows that Congress understood that such sex separation is not only beneficial but also sometimes necessary to ensure equal opportunities for women.

This aligns with Supreme Court decisions that have repeatedly confirmed that considering sex is not always discriminatory because the genuine biological differences between the sexes sometimes make them dissimilarly situated.  The Court recently reconfirmed that the Constitution "does not make sex a proscribed classification" because the sexes are often not similarly situated due to real biological differences. *United States v. Skrmetti*, 145 S. Ct. 1816, 1828 (2025) (quotation omitted); *see also id.* at 1878-79 (Sotomayor, J., dissenting) ("No one disputes that . . . there are 'biological differences between men and women'" and that "such physical differences" mean "sex is not altogether a proscribed classification." (citation omitted)).  The Supreme Court has also upheld laws that made sex distinctions based on the real biological differences between the sexes.  In *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464 (1981), the Court upheld a statutory rape law focused on protecting girls because "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse." *Id.* at 471.  The Court explained that the Equal Protection Clause does not require "things which are different in fact" "to be treated in law as though they were the same," and it has therefore "consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Id.* at 469 (citations omitted).  Likewise in *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53 (2001), the Court upheld a statute making it easier to claim citizenship for a child born abroad to an American mother than to an American father because "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood." *Id.* at 63.  "To fail to acknowledge even our most basic biological differences," the Court explained, "risk[ed] . . .  disserving" the equal protection guarantee. *Id.* at 73.

The Court has thus repeatedly affirmed that the "[i]nherent differences between men and women . . . remain cause for celebration." *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*").  Based on these inherent differences, sex can "represent[] a legitimate, accurate proxy" to pursue permissible legislative ends, *Craig v. Boren*, 429

8

1    U.S. 190, 204 (1976), such as "provid[ing] for the special problems of women,"

2    *Weinberger v. Wiesenfeld*, 420 U.S. 636, 653 (1975); *see also VMI*, 518 U.S. at 533-34

3    (Sex-based classifications may be used to compensate women for particular disabilities,

4    promote equal opportunity, and "advance full development of the talent and capacities of

5    our Nation's people." (citations omitted)).

6        More importantly, the Supreme Court has also particularly recognized the inherent

7    physical differences between the sexes in physical fitness and athletics.  In *VMI*, the

8    Court recognized an inherent male advantage when it found that admitting women to a

9    previously all-male military academy "would undoubtedly require" that institution "to

10   adjust aspects of the physical training programs."  518 U.S. at 550 n.19; *accord Bauer v.*

11   *Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (finding FBI did not violate Title VII when

12   using different physical fitness standards for agent candidates based on sex because

13   "[m]en and women simply are not physiologically the same for the purposes of physical

14   fitness programs.").[3]  And lower courts have recognized for decades that "the distinct

15   differences in physical characteristics and capabilities between the sexes" permit sex-

16   separated athletics under federal law.  *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563

17   F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that were play and

18   competition not separated by sex, the great bulk of the females would quickly be

19   eliminated from participation and denied any meaningful opportunity for athletic

20   involvement."), *abrogated on other grounds by Brentwood Acad. v. Tenn. Secondary*

21   *Sch. Athletic Ass'n*, 190 F.3d 705, 706 (6th Cir. 1999).  That includes the Ninth Circuit,

22   which long ago saw "no question" that sex-separated athletics permissibly accommodate

23   "real differences between the sexes."  *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d

24   1126, 1131 (9th Cir. 1982) ("*Clark I*") (citing, *e.g.*, *Michael M.*, 450 U.S. at 469).

25

26

27   [3] Congress itself has provided that "physiological differences between male and
     female individuals" warrant sex-based differences in physical-fitness admissions
     standards at military academies.  Pub. L. No. 94-106, Title VIII, § 803(a), 89 Stat. 531,

28   537 (Oct. 7, 1975); 10 U.S.C. § 7442 note.

9

These inherent physical differences justify separation in sports because males have an unfair biological athletic advantage over females.  *See, e.g.*, *id.* at 1131 ([D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team."); *Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989) ("*Clark II*") ("If males are permitted to displace females on the school volleyball team even to the extent of one player  . . . the goal of equal participation by females in interscholastic athletics is set back, not advanced."); *Adams.*, 57 F.4th at 819-20 (Lagoa, J., concurring) (discussing scientific literature regarding biological advantages of males over females in sports); *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, Circuit Justice) ("Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events.").  And, as explained *infra* Part A.4, the long-standing Title IX regulation also specifically uses biology to justify separating sports that involve "competitive skill" or "contact."  34 C.F.R. § 106.41(b).

That biological differences justify sex-separation in sports highlights another fundamental flaw in California's urging that Title IX encompasses "gender identity" here.  If "sex" means "gender identity" then California has no non-discriminatory basis for separating sports at all.

Accordingly, because males have an unfair physical advantage, males and females are not similarly situated in athletics, separating sports by sex is not "discrimination" under Title IX when the separation does not treat either sex worse than the other.  When the separation *does* treat one sex worse, the separation is discriminatory.

3.    California's Gender Identity Policy Violates Title IX by Harming Girls and Their Equal Opportunities.

California's gender identity policy treats females worse than males.  The policy violates both the underlying justification for separating sports and Title IX's overriding command that the sex separation in athletics cannot disadvantage either sex.  Contrary to

Title IX, California's policy jettisons biology as its justification for separation and causes an imbalanced, unfair disadvantage to female athletes.

As discussed above, the physical advantages of males make the sexes dissimilarly situated in athletics and provides the only justification for why Title IX does not prohibit separating teams by sex as discrimination. California's policy breaks this justification. Title IX prohibits an educational program from allowing some male athletes to compete on female teams because that directly undermines the justification for separating the sports in the first place. Although sex-separated athletics are not ordinarily discriminatory under Title IX, that is because such classification is permissibly accounting for real biological differences between women and men to avoid subjecting women to a competitive disadvantage. When an educational program such as California's chooses to allow some male athletes to compete on female teams, thereby subjecting females to an unfair competitive disadvantage, it severely undermines its justification for separating the teams at all. In other words, since California's gender identity policy disregards the real biological differences between boys and girls, it is now "discriminating" by separating the sexes without any valid basis (and at the same time disadvantaging one of the sexes). Having thrown out the biological justification, California's policy is akin to separated math classes where there are no relevant biological differences between the sexes.

California's argument (at 8-11) that it is accounting for trans-identifying athletes cannot override that biology justifies separation under Title IX, and that the separation cannot disadvantage either of the sexes. The rationale that generally justifies sex-separated athletics under Title IX applies equally to athletes who are trans-identifying, "meaning that their gender identity does not align with their biological sex." *Skrmetti*, 145 S. Ct. at 1824. Regardless of whether these athletes *identify* with the opposite sex, they possess the *biology* of their own sex.

Nor does excluding males who identify as females from female teams constitute "discrimination" "on the basis of sex" under Title IX. When it comes to competitive

athletics, males are not similarly situated to females given their physiological differences. This remains true whether or not the male identifies as a female. As the teams are permissibly separated based on biological sex, it does not somehow become prohibited sex discrimination to neutrally apply that valid criterion to trans-identifying students like everyone else. Their subjective gender identity has nothing to do with the objective biological differences justifying sex-separated sports. Accordingly, barring a trans-identifying male from competing on female teams is not providing less favorable treatment than females receive. *Jackson*, 544 U.S. at 174. Rather, it is ensuring *equal* treatment for both sexes and not unfairly harming female athletes.[4]

Put differently, California's gender identity policy is not seeking to prevent discrimination on the basis of sex, but rather instituting a preferential "accommodation" on the basis of gender identity. *See Doe 2* v. *Shanahan*, 917 F.3d 694, 707 (D.C. Cir. 2019) (Williams, J., concurring) (rejecting challenge to sex-separated military facilities and standards). According to California's policy, while some males are validly excluded from competing against females, other males must be allowed to do so—despite the objective physiological advantages that they too have as males—merely because they subjectively identify as females. The policy turns Title IX on its head by requiring schools to discriminate in favor of some males at the expense of and harm to females.[5]

Moreover, California's policy also clearly violates Title IX's purpose: Title IX was manifestly passed to promote "girls' and women's rights." *Adams*, 57 F.4th at 817

---

[4] Title IX permits schools to allow girls to participate in boys' sports where consistent with safety and privacy, as doing so would not afford girls the competitive biological advantage that boys would gain if allowed to participate in girls' sports. *E.g.*, *Clark I*, 695 F.3d at 1127, 1130 (finding "precluding boys from playing on girls' teams, even though girls are permitted to participate on boys' athletic teams," is "a legitimate means of providing athletic opportunities for girls"). Allowing girls to play in boys' sports thus and does not subject any athlete to less favorable' treatment based on that athlete's sex. *Jackson*, 544 U.S. at 174.

[5] Further showing the breakdown of Defendants' policy, it also conflicts with its purported justification because it discriminates based on "gender identity." The policy permits males who "identify as female" to play in female sports, but at the same time precludes males who "identify as male" to play in female sports.

(Lagoa, J., concurring); *see also McCormick*, 370 F.3d at 286 ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities.").  And Title IX has achieved substantial success in that regard, especially in sports.  "[O]ne need not look further than the neighborhood park or local college campus to see the remarkable impact Title IX has had on girls and women in sports." *Adams*, 57 F.4th at 818 (Lagoa, J., concurring).  "In 1971, before Congress enacted the statute, approximately 300,000 girls and 3.67 million boys played competitive high school sports nationwide." *McCormick*, 370 F.3d at 286.  Title IX "has had stellar results" with girls' participation growing to approximately 3.25 million in 2011. *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 390 (W.D. La. 2024).

California's policy, which "comingl[es] both biological sexes in the realm of female athletics," has "vast societal consequences" and "threaten[s] to undermine one of Title IX's major achievements, giving young women an equal opportunity to participate in sports." *Adams*, 57 F.4th at 818, 821 (Lagoa, J., concurring) (brackets omitted); *see Clark II*, 886 F.2d at 1193 ("If males are permitted to displace females on the school volleyball team even to the extent of one player . . . , the goal of equal participation by females in interscholastic athletics is set back, not advanced.").  This just further confirms that California's policy violates Title IX.  *See Abramski* v. *United States*, 573 U.S. 169, 179 (2014) ("[The Court] must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." (quotation marks omitted)).

This Court thus should find California's gender identity policy violates Title IX.

### 4.    The Athletics Regulation Further Confirms California's Gender Identity Policy Violates Title IX and Girls' Equal Opportunities.

The decades-old athletics regulation that expressly contemplates sex-separated athletics and requires equal athletic opportunities confirms that California's gender identity policy violates Title IX.  *See* 34 C.F.R. § 106.41.  Like the statute, that regulation first generally prohibits discrimination on the basis of sex in athletics.  *Id.*

§ 106.41(a).  Like the statutory analysis above, the regulation then recognizes the physical differences in athletics by clarifying that programs can separate teams "for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  *Id.* § 106.41(b).  But also like the analysis above, the regulation requires that this separation and the program overall cannot harm one of the sexes, but rather must still "provide equal athletic opportunity for members of both sexes."  *Id.* § 106.41(b); *see also*, *e.g.*, *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 611 (6th Cir. 2024) ("[A]thletics programs solely used biological sex as a classification method for decades—an approach authorized by existing Title IX regulations.").

As above, Congress specifically requested these regulations and that they include for athletics "reasonable provisions considering the nature of particular sports" and declined to disapprove these regulations.  Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974); *see McCormick*, 370 F.3d at 287.  Congress thus expressly identified "the nature of particular sports" as a relevant factor in "implementing the provisions of title IX."  88 Stat. at 612.  This direction reflected Congress's acknowledgement that, while sex is irrelevant to how an student performs in a classroom or on the job, sex does affect how an student performs on the sports field. *See McCormick*, 370 F.3d at 286.  And as above, this regulation "accurately reflect[s] congressional intent," *Grove City*, 465 U.S. at 568, and Title IX's original public meaning, *see Loper Bright*, 603 U.S. at 394.

Like the statute, the regulation uses "sex," not gender identity, and provides no exception to biology-based sex-separation for some males.[6]  Most importantly, the regulation requires any such separation not harm girls, but rather must provide them "equal athletic opportunity."  34 C.F.R. § 106.41(c).  While male sports maintain fair and safe competition in California, Defendants' gender identity policy forces female

---

[6]  Males do not fit into the regulation's "try-out" exception when a program offers a sport for one sex and not the other and "athletic opportunities for members of that [excluded] sex have previously been limited."  34 C.F.R. § 106.41(b).

athletes to participate in unfair and unsafe competition, where female athletes risk injuries and are deprived of awards and advancement; the discriminatory policy thus denies them equal athletic opportunities. *See, e.g.*, Compl. ¶¶ 1-2, 8, 90-95; Exec. Order No. 14201, 90 Fed. Reg. at 9279 ("In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports."); *McCormick*, 370 F.3d at 294-95 ("Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes.").

This Court should accordingly find that the regulation, and its equal opportunity mandate, confirm that California's gender identity policy violates Title IX.

**B.    California's Attempts to Sidestep Title IX Fail.**

1.    California's Cases are Inapposite in this Context of Title IX and Sex-Separated Sports.

California cites inapposite case law in an attempt to defend its inequitable policy that disadvantages girls. All these cases either concern contexts outside of Title IX and athletics, or particularly note the limited reach of their precedential value. This Court should accordingly find these cases provide California no shield against its Title IX discrimination against girls in athletics.

First, California incorrectly urges (at 9) that *Bostock v. Clayton County*, 590 U.S. 644 (2020), morphs Title IX's prohibition on sex discrimination to also include gender identity, such that Title IX bars the longstanding practice of sex-separated athletics. The *Bostock* decision, however, does not extend to Title IX and athletics here. *Bostock* itself notes its limitations, specifically warning it did "not purport to address bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681.

Even if *Bostock* somehow applied to Title IX here, *Bostock* is entirely consistent with the United States' position. In determining whether a practice discriminates based

on sex, *Bostock* requires a similarly situated analysis:  "[D]iscrimination" means
"treating [an] individual worse than others who are similarly situated."  590 U.S. at 657.
In other words, *Bostock* stressed that to determine whether a policy "discriminate[s]," a
court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly
situated."  *Id.*  In *Bostock*, male and female employees were similarly situated because
"[a]n individual's homosexuality or transgender status is not relevant to employment
decisions."  *Id.* at 660.  Unlike in *Bostock*, males and females are not similarly situated
when it comes to sports; sex is relevant.  Otherwise, California would have no non-
discriminatory basis to separate athletic teams by sex in the first place.

The Supreme Court's recent *Skrmetti* decision confirms that separating athletes
based on sex, as Title IX requires, does not violate *Bostock*.  In *Skrmetti*, the challenged
law, "[o]n its face," classified "based on age" and "based on medical use," not "on the
basis of transgender status."  145 S. Ct. at 1829-33.  Even when asked to apply *Bostock*,
the *Skrmetti* Court found facially neutral laws do not discriminate based on gender
identity even if they disproportionately effect trans-identifying individuals, such as by
banning use of a medical treatment for a condition that "only transgender individuals"
would seek to remedy.  *Id.* at 1833.  Similarly here, correctly interpreting Title IX as
requiring that athletics be separated by sex "does not classify [or otherwise discriminate]
on the basis of transgender status," as one cannot "automatically switch" male to female
in the sports context.  *Id.*  And this remains so despite California's attempt to focus on
potential effects on trans-identifying athletes.  *Cf. id.* at 1852 (Barrett, J. concurring)
("[T]ransgender status implicates several other areas of legitimate regulatory policy—
ranging from access to restrooms to eligibility for boys' and girls' sports teams . . .
legislatures have many valid reasons to make policy in these areas.").

If *Bostock* applied as California wishes, then it would flip Title IX upside down.
For example, Title IX makes clear that recipients can "maintain separate living facilities
for the different sexes."  20 U.S.C. § 1686.  If *Bostock* applied how California claims,
then this provision (and the other Title IX sex-separation carveouts) "would be rendered

meaningless" and bizarrely provide double protection for trans-identifying students.
*Adams*, 57 F.4th at 813-14 & n.7.  A person "would be able to live in both living
facilities associated with their biological sex and living facilities associated with their
gender identity or transgender status."  *Id.*[7]  Thus, *Bostock* does not convert a practice of
keeping males who identify as females off female teams into "discrimination" "on the
basis of sex" under Title IX.

Second, California's other cases are unpersuasive.  California relies (at 2, 9) on
*Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022), and *Grabowski v. Ariz. Bd. of Regents*,
69 F.4th 1110, 1116-18 & n.1 (9th Cir. 2023), but these cases do not involve separating
athletes based on sex, where the sexes are not similarly situated.  In *Snyder*, minor
females challenged an Arizona law precluding insurance coverage for sex change
procedures.  The Ninth Circuit upheld the district court's determination that they failed
to show double mastectomy surgeries were medically necessary or safe and effective for
them, and its reference to *Bostock* and Title IX was unnecessary dicta.  28 F.4th at 114-
15; *id.* at 113 ("We do not reach the merits of Doe's constitutional and statutory
challenges").[8]  In *Grabowski,* the court concluded that discrimination on the basis of
sexual orientation can be a form of sex-based discrimination under Title IX.  69 F.4th at
1116-18 & n.1.  While the backdrop of the sexual harassment claim was athletics, that

---

[7] In any event, *Bostock* does not apply to athletics under Title IX.  If any non-
abrogated Ninth Circuit precedent says otherwise, the United States preserves an
argument that *Bostock* does not apply to Title IX at all.  The Supreme Court recently
made clear that it has not decided "whether *Bostock*'s reasoning reaches beyond the Title
VII context."  *Skrmetti*, 145 S. Ct. at 1834.  And rightly so: *Bostock* is a case about Title
VII, not Title IX.  *See, e.g., Tennessee*, 2024 WL 3453880, at *2-3 (concluding that
*Bostock* does not extend to Title IX because "the statutes use materially different
language," "serve different goals," and "have distinct defenses"); *Alabama*, 2024 WL
3981994, at *4-5 (collecting cases); *Soule*, 90 F.4th at 63 (Menashi, J., concurring)
(discussing "important differences between the two statutes").

[8] Regardless, Supreme Court's decision in *Skrmetti* has abrogated any contrary
language in *Snyder*.  *See Folwell v. Kadel*, 145 S. Ct. 2838 (2025) (vacating and
remanding a case on similar issues in light of *Skrmetti*); *cf. Lange v. Houston Cnty.*, ---
F.4th ----, No. 22-13626, 2025 WL 2602633 (11th Cir. Sept. 9, 2025) (en banc)
(applying *Skrmetti* to a similar claim as that at issue in *Snyder* and concluding no sex
discrimination).

setting was not relevant to the claim, which could have been set in the classroom. Compared to here, the plaintiffs' claim had, and sexual orientation has, nothing to do with sports and inherent biological advantages. *Grabowski* thus did not involve a claim where it was relevant that the sexes are not similarly situated, *i.e.*, where the real biological differences between the sexes are relevant.

California similarly missteps in relying (at 9, 17) on the limited holdings of *Doe v. Horne*, 115 F.4th 1083 (9th Cir. 2024), *petition for cert. filed*, No. 24-449 (U.S. Oct. 22, 2024), and *Hecox v. Little*, 104 F.4th 1061 (9th Cir. 2024), *cert. granted,* No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025). In *Horne*, the court found no abuse of discretion in the district court's preliminary injunction of an Arizona sports statute as applied to two students. 115 F.4th at 1112. The court specified the limitations of the decision — namely, that the "narrow preliminary injunction" applied to the particular facts and two students and that nothing in the "decision, or in the district court's decision, precludes policymakers from adopting appropriate regulations in this field." *Id*. The court highlighted the district court's finding that the statute purposefully targeted trans-identifying males. *Id. at* 1104-05. Most importantly, the *Horne* court particularly did not decide the asserted Title IX claim and did not bless a blanket practice of allowing males to participate in women's sports, which California has here. *Id.* at 1110-11.

Similarly in the earlier *Hecox* decision, the court issued a limited decision as to how an Idaho statute applied to the single plaintiff athlete. The court explained: "we need not and do not decide the larger question of whether any restriction on transgender participation in sports violates equal protection. Heightened scrutiny analysis is an extraordinarily fact-bound test, and today we simply decide the narrow question of whether the district court, on the record before it, abused its discretion in finding that [student Hecox] was likely to succeed on the merits of her equal protection claim." 104 F.4th at 1091. Like *Horne*, the *Hecox* decision particularly relied on the finding that the statute purposefully targeted trans-identifying males. *Id.* at 1074-78. California here cannot credibly claim that Congress enacted Title IX to purposefully target trans-

18

1   identifying students.  Additionally, the *Hecox* court did not decide a Title IX claim, and

2   even vacated the district court's injunction as applied beyond the particular student.  *Id.*

3   at 1091.  The *Hecox* and *Horne* cases accordingly do not shield California's policy from

4   Title IX here.  And, as above, this Court should view all of California's cited cases in the

5   context of the Supreme Court's recent decision in *Skrmetti*.

6       2.    California's Proposed Application of the Policy Interpretation of the

7             Regulation Conflicts with Title IX.

8       California attempts (at 13-18) to invoke an inapplicable Policy Interpretation

9   from 1979, 44 Fed. Reg. at 71415, to argue that the United States' claims are not "valid."

10  California seemingly submits that all Title IX claims involving sports must be rigidly

11  analyzed as "effective accommodation" or "equal treatment" claims according to that

12  Policy Interpretation.  California's gender identity policy that jettisons biology, however,

13  violates the statute and makes that Policy Interpretation of the regulations inapplicable.

14      The Policy Interpretation, and Ninth Circuit's "effective accommodation" and

15  "effective treatment" precedents, all concern potential inequalities in *properly sex-*

16  *separated* athletics programs.  The Policy Interpretation was geared toward analyzing

17  particular aspects of programs that already purported to separate by sex and only sex.

18  Here California never makes it that far.  The gender identity policy does not purport to

19  separate only by sex, but also has an overriding exception for gender identity.

20  California's failure to properly separate by sex in the first place causes a Title IX

21  violation because of the policy's *improper separation* itself, before getting to any

22  secondary analysis of "effective accommodation" and "equal treatment."

23      Beyond this, applying the Policy Interpretation here runs into other applicability

24  problems.  Like the statute itself, *see supra* Part A.1, the Policy Interpretation from 1979

25  deals with "sex" not "gender identity."  And the previous Ninth Circuit cases, which also

26  dealt with "sex" and not "gender identity," showed considerable deference to that Policy

27  Interpretation.  *See Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 965 n.9

28  (9th Cir. 2010) (finding Policy Interpretation entitled to deference under *Chevron U.S.A.*

19

1  *v. Natural Res. Def. Council*, 467 U.S. 837 (1984)); *cf. Loper Bright Enters.*, 603 U.S. at

2  412 (overruling *Chevron*).

3        Moreover, the athletic regulation itself overall requires "equal athletic opportunity

4  for members of both sexes," 34 C.F.R. § 106.41(c), and then explains that the effective

5  accommodation factor, *id.* § 106.41(c)(1), and equal treatment factors, *id.*

6  § 106.41(c)(2)-(10), are non-exhaustive "factors" to consider.  This Court can and should

7  consider California's overriding exception for trans-identifying males as a dispositive

8  factor.  This Court should accordingly reject California's argument that violations of

9  Title IX and equal opportunity can only come in the form of the Policy Interpretation and

10  rigid applications of traditional "effective accommodation" and "equal treatment"

11  claims.  *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310-11 (2025) (affirming

12  discrimination depends on factual context, and tests for employment discrimination

13  "never intended to be rigid, mechanized, or ritualistic" (citation omitted)).

14        Even if somehow applicable, the United States has also plausibly alleged facts to

15  support a claim under California's rigid application of the Policy Interpretation.  The

16  gender identity policy violates the Policy Interpretation's guidance that overall a policy

17  should not be "discriminatory in language or effect."  *See* 44 Fed. Reg. at 71418 (for

18  effective accommodation claims); *id.* at 71,417 (for equal treatment claims); *see also*

19  Compl. ¶ 10 ("Defendants' adopted and implemented policies intentionally deny and

20  have the effect of denying girls equal educational opportunities, including athletics.").

21  For effective accommodation, California acknowledges (at 14 n.2) that the Complaint

22  pleads several allegations about effective accommodation.  This includes a whole section

23  entitled "*Defendants' Failure to Accommodate Girls' Interests* and Retaliation Against

24  Girls Expressing Opposition to Defendants' Policies."  *See* Compl. ¶¶ 90-97 (emphasis

25  added).[9]  For equal treatment, the Complaint gives five examples of trans-identifying

26  _____

27        [9] California's attack (18) on the Complaint's inclusion of retaliation examples
incorrectly frames this lawsuit like a single student private enforcement action, rather

28  than a federal enforcement action to remedy pervasive violations.  The United States did
*(footnote cont'd on next page)*

1  males competing in female sports.  Because of the gender identity policy, each one of
2  those sports across the CIF system can no longer count as "female" toward the balance
3  of equal treatment between males and females, as those sports now are, at best, co-ed.

4              3.    California's had Clear Notice that Title IX Prohibits Discrimination
5                    Based on Sex, not Gender Identity.

6          As above, according to its plain original public meaning from 1972, Title IX
7  prohibits discrimination based on sex, not gender identity, and does not allow trans-
8  identifying males to competed in sports designated for girls.  Multiple references in the
9  statute refer to sex as binary, which is inconsistent with the fluid concept of subjective
10 gender identity.  The statute prohibits the same conduct today as it originally did in 1972.
11 And the statute's clarity is reinforced by the longstanding regulation that Congress
12 specifically requested and was promulgated shortly after the statute's enactment.  *See*
13 *Grove City*, 465 U.S. at 568; *Loper Bright*, 603 U.S. at 394.  Despite this clarity,
14 California submits (at 18-22) that it lacked clear notice that Title IX prohibits sex
15 discrimination and does not extend to gender identity.  California's claimed ignorance
16 conflicts with the plain notice that the statute itself provides, as well as multiple court
17 decisions and executive orders.

18         Congress has broad power to set the terms on which it disburses federal money,
19 but when Congress attaches conditions to a recipient's acceptance of federal funds, the
20 conditions must be set out unambiguously.  *Roe v. Critchfield*, 137 F.4th 912, 928-29 (9th
21 Cir. 2025) (citing *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296
22 (2006).  In considering whether a law provides clear notice for purposes of the Spending
23 Clause, courts begin with the text.  *Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at
24 296-97.  When the statutory text "is plain, the sole function of the courts—at least where
25 the disposition required by the text is not absurd—is to enforce it according to its terms."
26 *Id.* (citations omitted).

27 ─────────────────────
   not allege the retaliation examples as standalone claims; their inclusion provides context
28 and completeness regarding how California's failure to comply with Title IX harms girls.

Here, as explained *supra* Part A.1, Title IX's plain text explicitly references sex, not gender identity, and employs sex as a binary term that is incompatible with gender identity.  Moreover, as above, the regulations adopted nearly contemporaneously with the statute, and at Congress's direction, also employs sex as a binary term that is incompatible with gender identity.  And multiple statutes since Title IX show that Congress knows how to include "gender identity" explicitly in statutes when it so desires, and did not in Title IX.

Facing this plain meaning, California attempts to conjure up confusion by pointing (at 20) to the last time Defendant CDE entered into a Title IX contractual assurance on November 20, 2024.  *See also* Compl. ¶ 38.  At that time, however, at least nine federal courts had rejected a regulation attempting to redefine sex as "gender identity" under Title IX, (similar to California's policy here), because it subverted the original purpose of the law.[10]  More importantly, at that time the Supreme Court had already stated on August 16, 2024, that "all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to . . . the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation *and gender identity*." *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024) (emphasis added).  California thus cannot claim lack of notice from the statute or the courts at the time of its last contractual assurance.

Additionally, California received even more confirmation through two executive orders.  As a condition of accepting federal funds under Title IX, CDE was required to and did submit assurances, which included an assurance that CDE "[w]ill comply with all applicable requirements of all . . . executive orders."  Compl. ¶ 38; 34 C.F.R. § 106.4(a); *see also* 34 C.F.R. § 75.700 ("A grantee must comply with . . . Executive

---

[10] *See, e.g., Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) (order); *Louisiana v. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) (per curiam); *Oklahoma v. Cardona*, 743 F. Supp. 3d 1314 (W.D. Okla. 2024); *Arkansas v. Dep't of Educ.*, 742 F. Supp. 3d 919 (E.D. Mo. 2024); *see id.* at 940-41 (citing cases and noting that "[e]ach of these courts has preliminarily enjoined implementation of the Rule" and "[n]o court has denied the requested relief").

orders."). On January 20, 2025, the President issued Executive Order 14168,
"Defending Women from Gender Ideology Extremism and Restoring Biological Truth to
the Federal Government." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025).
Like Title IX, that Executive Order specifically "recognize[s] two sexes, male and
female," and defines "sex" for the purpose of Executive Branch interpretation and
application of federal law as referring "to an individual's immutable biological
classification as either male or female." *Id.* § 2. The Executive Order also specifically
references federal funding. *Id.* § 3.

On February 5, 2025, the President issued Executive Order 14201, "Keeping Men
Out of Women's Sports." Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 11, 2025).
Like Title IX, the Order adopted definitions concerning "sex" from the prior Executive
Order 14168. *Id.* § 2. The second Executive Order also specifically directed the
Secretary of Education to "take all appropriate action to affirmatively protect all-female
athletic opportunities and all-female locker rooms" in line with Title IX, and "prioritize
Title IX enforcement actions against educational institutions (including athletic
associations composed of or governed by such institutions) that deny female students an
equal opportunity to participate in sports and athletic events by requiring them, in the
women's category, to compete with or against or to appear unclothed before males." *Id.*
§ 2. The Executive Order also specifically references Title IX and federal funding. *Id.*

These Executive Orders provide more confirmation of Title IX's meaning and the
United States' potential enforcement. California cannot claim it lacked knowledge of
these Orders or their laying out the consequences for continuing to violate Title IX. Yet,
California continued to flout the law and keep drawing down federal funding afterwards.

California attempts (at 20-22) to invoke several inapposite Ninth Circuit cases that
particularly noted their limitations. For example, Defendant cite *Doe v Snyder,* which as
explained above denied a trans-identifying person's request for a mandatory injunction
to get mastectomy surgery, and its reference to Title IX was unnecessary dicta. 28 F.4th
at 113-15 ("We do not reach the merits of Doe's constitutional and statutory

challenges."). Additionally, in *Doe v. Horne* again the court specified the decision's limited application to the particular facts and two students, skipped over the Title IX claim, and noted nothing "precludes policymakers from adopting appropriate regulations in this field." 115 F.4th at 1110-11. Similar for *Hecox*, which issued a limited decision as to how the statute applied to a single athlete, vacated the injunction beyond the single athlete, and skipped the Title IX claim. 104 F.4th at 1091. And *Hecox* particularly explained it was not deciding the "larger question of whether any restriction on transgender participation in sports violates equal protection." *Id.*

California also relies on *Roe v. Critchfield*, where the Ninth Circuit upheld an Idaho statute limiting public school students to restrooms corresponding to their biological sex against an Equal Protection challenge. The court found the statute satisfied Equal Protection because it was substantially related to the important government interest in privacy. 137 F.4th at 922-26.[11] In assessing the separate Title IX claim, the court found the defendant lacked clear notice of Title IX's prohibitions related to restrooms, and affirmed the dismissal of the Title IX claim against the sex-separated bathrooms. *Id.* at 929, 931-32. Importantly, and contrary to California's assertions, *Critchfield* explained that the Ninth Circuit has "never addressed [the definition of sex in Title IX] directly, and we need not reach it here." *Id.* at 928. The court found that defendant did not have clear notice of Title IX's prohibitions related to restrooms when it accepted federal funding after it passed the statute *in 2023*. *Id.* at 921, 931 n.16.

---

[11] The Complaint includes allegations that California's policy violates Title IX by forcing girls to share intimate spaces, such as locker rooms, with boys and this environment harms girls and their educational opportunities. *See, e.g.*, Compl. ¶¶ 5, 45, 54, 86-89; *VMI*, 518 U.S. at 550 n.19 (1996) ("Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs."). Also, as above with sports, California's policy throws out the biological reason for separating these locker rooms, and California is left with no non-discriminatory reason for separating the locker rooms at all. Without the biological justification, California lacks a basis to keep any boy from using either locker room, or any girl from using either locker room. To the extent any non-abrogated Ninth Circuit precedent forecloses this argument, the United States preserves this it. *See* Defs. Br. at 10 n.8 (citing *Parents for Priv. v. Barr*, 949 F.3d 1210, 1217, 1227-29 (9th Cir. 2020)).

Comparatively here, California had clear notice from the courts when Defendant CDE entered the November 2024 contractual assurance, and surely had notice of the Executive Orders and kept taking drawdown instalments of federal funding. Indeed, *Critchfield* even particularly notes that an Executive Order could "provide prospective notice" in a different case. *Id.* at 931 n.16.

California also contends (at 19, 21) it lacked clear notice because the United States has not previously challenged the state's law that has been in existence for "over a decade." This proposed circular trap, where the United States cannot challenge a law unless it has done so previously, obviously cannot be required for notice. The United States notes that the Education Department recently in 2020 made clear funding recipients must still comply with Title IX and implementing regulations regardless of state law or rule or regulation by an organization like CIF. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,573 (May 19, 2020) (§ 106.6(h)). And enforcement decisions "often involve[ ] a complicated balancing of a number of factors." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Those include "whether agency resources are best spent on this violation or another," and "whether the particular enforcement action requested best fits the agency's overall policies. *Id.* Here, the increased frequency of boys playing in girls' sports across the Nation pursuant to California's policy and other states' policies has made enforcement of Title IX and its protections for girls a high priority. *See id.*; Exec. Order 14201 (confirming the policy of the United States to "affirmatively protect all-female athletic opportunities and all-female locker rooms and thereby provide the equal opportunity guaranteed by Title IX of the Education Amendments Act of 1972").

## III.    CONCLUSION

The Court should deny Defendants' Motion in its entirety.

DATED: September 19, 2025.

Respectfully submitted:

BILAL A. ESSAYLI
United States Attorney

RICHARD M. PARK
Chief, Civil Rights Section

*/s/ Julie A. Hamill*
_____

JULIE A. HAMILL
Assistant United States Attorney
United States Attorney's Office

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Senior Counsel
Civil Rights Division

*/s/ Matthew J. Donnelly*
_____

MATTHEW J. DONNELLY
Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

26

# CERTIFICATE OF COMPLIANCE

The undersigned counsel for the United States certifies that this brief complies with the page limit and other specifications of this Court's Standing Order, ECF No. 16.


*/s/ Matthew J. Donnelly*

MATTHEW J. DONNELLY
Attorney for the United States


DATED: September 19, 2025