Name Julie A. Hamill, AUSA
Address 300 N Los Angeles, Suite 7516
City, State, Zip Los Angeles, CA 90012
Phone (213)894-2464
Fax (213)894-0141
E-Mail julie.hamill@usdoj.gov

☐ FPD ☐ Appointed ☐ CJA ☐ Pro Per ☐ Retained

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

United States of America

PLAINTIFF(S),

v.

California Interscholastic Federation, et al.

DEFENDANT(S).

CASE NUMBER:

8:25-cv-01485-CV-JDE

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that United States of America hereby appeals to
*Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
Order granting Defendants' Motion to Dismiss, ECF # 54

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on 8/31/26. Entered on the docket in this action on 8/31/26.

A copy of said judgment or order is attached hereto.

October 20, 2026
Date

/s/ Julie A. Hamill
Signature
☐ Appellant/ProSe ☒ Counsel for Appellant ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,
Plaintiff,
v.
CALIFORNIA INTERSCHOLASTIC FEDERATION *et al.*,
Defendants.

Case No. 8:25-cv-01485-CV (JDEx)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

**[DOC. # 25]**

Plaintiff United States of America brings this case against Defendants California Department of Education ("CDE") and California Interscholastic Federation ("CIF") over California's rules for transgender students in school athletics. Those rules require schools to permit transgender girls to compete on girls' teams and use girls' athletic facilities consistent with their gender identity. Plaintiff contends that Title IX instead requires schools receiving federal funds to determine eligibility for girls' teams and facilities based on biological sex. The Court need not resolve that question. Even assuming Title IX requires what Plaintiff contends, CDE lacked clear notice of that requirement as a condition of federal funding. The Spending Clause therefore bars Plaintiff from enforcing the asserted funding condition in this action.

Before the Court is Defendants' Joint Motion to Dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6). Doc. # 25 ("Motion"). Plaintiff filed an opposition on September 19, 2025, Doc. # 27 ("Opposition"), and Defendants filed a reply on October 3, 2025, Doc. # 29 ("Reply"). [1]

On January 29, 2026, the Court found that oral argument was not necessary to resolve the Motion, and took it under submission. Doc. # 35; *see* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15; *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

The Court has considered the Motion and all related filings. For the reasons discussed below, the Motion is GRANTED. Because Defendants were not given clear

---

[1] After the Motion was fully briefed, Defendants filed a Notice of Supplemental Authority identifying the Eighth Circuit's decision in *Female Athletes United v. Ellison*, No. 25-2899, as additional authority supporting their Spending Clause clear-notice argument. Doc. # 42. Plaintiff filed an ex parte application to strike the notice or, alternatively, for leave to respond, arguing that Defendants' notice improperly presented supplemental argument and mischaracterized *Ellison*'s relevance to this federal enforcement action. Doc. # 44. Defendants opposed, arguing that the notice properly identified new appellate authority relevant to the clear-notice issue and that Plaintiff's ex parte application already supplied Plaintiff's substantive response. Doc. # 46. Plaintiff's ex parte application is DENIED. The Court has considered *Ellison* and Plaintiff's substantive response.

On July 1, 2026, Plaintiff filed a Notice of Supplemental Authority identifying the Supreme Court's decision in *West Virginia v. B.P.J.*, No. 24-43. Doc. # 52. On July 6, 2026, Defendants filed a response to the Notice of Authority. Doc. # 53. The Court has considered *West Virginia* and Defendants' substantive response.

notice of the funding condition Plaintiff now seeks to enforce, Plaintiff's claims are barred by the Spending Clause.

## I. INTRODUCTION

Plaintiff filed the Complaint on July 9, 2025. Doc. # 1. Count I alleges that Defendants violated Title IX (20 U.S.C. § 1681, *et seq.*) and its implementing regulations. *Id.* ¶¶ 105–11. Count II alleges that CDE breached contractual assurances requiring compliance with Title IX. *Id.* ¶¶ 112–16. Plaintiff seeks declaratory and injunctive relief, monitoring and enforcement mechanisms, compensation for allegedly affected athletes, correction of past athletic records, damages, costs, and fees. *Id.* ¶ 117. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1345.

## II. BACKGROUND

### A. The Parties

Plaintiff is the United States of America. Doc. # 1 ¶ 12.

CDE receives and distributes federal education funds. *Id.* ¶ 15. The Complaint alleges that CDE has authority over CIF and local school districts' interscholastic athletic policies. *Id.* ¶¶ 16, 40–42.

CIF is a statewide nonprofit association that governs high-school athletics in California. *Id.* ¶ 13. Its 1,615 public, charter, and private member schools serve more than 750,000 student-athletes. *Id.* CIF is governed by a Federated Council composed of representatives from schools, districts, and California educational and athletic associations. *Id.* ¶ 14.[2]

### B. Title IX and the Athletics Regulation

Title IX provides that no person shall, "on the basis of sex, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any

---

[2] Defendants state that CIF does not receive federal funds. Doc. # 25-1 at 25 n.17; Doc. # 29 at 20 n.7. The Complaint alleges, however, that CDE receives federal funds, distributes federal funds to local schools, has authority over CIF and local school districts' interscholastic athletic policies, and may require CIF or school districts to adjust their policies to comply with federal law. Doc. # 1 ¶¶ 15–16, 40–42.

education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute did not expressly address athletics. Two years after its enactment, Congress directed the Department of Health, Education, and Welfare to issue Title IX regulations related to athletic activities that included "reasonable provisions considering the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612; *West Virginia v. B.P.J.*, 146 S. Ct. 2356, 2370 (2026).

The resulting athletics regulations for recipients of Federal financial assistance appear at 34 C.F.R. § 106.41. Section 106.41(a) prohibits sex discrimination in interscholastic, intercollegiate, club, and intramural athletics. Section 106.41(b) permits a recipient to operate separate teams for members of each sex where selection is based on competitive skill or the activity is a contact sport. Section 106.41(c) requires recipients to provide equal athletic opportunity for members of both sexes and identifies factors bearing on that inquiry.

A separate regulation permits recipients to provide separate toilet, locker-room, and shower facilities on the basis of sex, provided the facilities are comparable. 34 C.F.R. § 106.33. Section 106.6 further provides that a recipient's Title IX obligations are not obviated or alleviated by contrary state law or by the rules of a private athletic association. *Id.* § 106.6(b)–(c).

**C. California's Participation Policy**

California Education Code § 221.5(f), enacted in 2013, provides that a pupil may participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with the pupil's gender identity, regardless of the gender listed in the pupil's records. Doc. # 1 ¶ 47.

CDE has published guidance stating that local educational agencies must comply with California sex-equity laws in addition to Title IX. *Id.* ¶ 46. CIF Bylaw 300.D similarly provides that students should be able to participate in CIF activities consistent

with their gender identity. *Id.* ¶ 52. CIF has also issued participation procedures and guidance addressing facilities. *Id.* ¶¶ 53, 55.[3]

The Complaint alleges that CDE submitted a Grant Certification dated November 20, 2024, applicable to all federal funding. *Id.* ¶ 38. In that Certification, CDE agreed that it "[w]ill comply with all applicable requirements of all other Federal laws, executive orders, regulations, and public policies governing financial assistance awards," including Title IX. *Id.*

**D. Federal Policy and Legal Developments Before This Lawsuit**

In April 2024, the United States Department of Education issued a final rule providing generally that sex discrimination includes discrimination based on gender identity. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33886 (Apr. 29, 2024). The rule did not establish a final standard for athletic eligibility. *Id.* at 33817. Several courts enjoined enforcement of central provisions of the rule, and the Supreme Court denied applications to stay those injunctions. *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867–68 (2024). The rule was later vacated. *Tennessee v. Cardona*, 762 F. Supp. 3d 615, 627–28 (E.D. Ky. 2025).

The federal position changed after the presidential administration changed in January 2025. Executive Order 14168 defined sex for Executive Branch purposes in biological terms. Exec. Order No. 14168, 90 Fed. Reg. 8615, 8615–18 (Jan. 30, 2025); Doc. # 1 ¶ 27. Executive Order 14201 directed the Department of Education to prioritize Title IX enforcement against institutions that allow students whom the Order classifies as male to participate in female athletics or use female locker rooms. Exec. Order No. 14201, 90 Fed. Reg. 9279, 9279–80 (Feb. 11, 2025); Doc. # 1 ¶ 27.

On March 11, 2025, CIF's Executive Director asked CDE for immediate direction concerning CIF's obligations under California law following Executive Order

---

[3] This Order refers to § 221.5(f), CIF Bylaw 300.D, and the related CDE and CIF guidance alleged in the Complaint collectively as "California's policy."

14201. Doc. # 1 ¶ 50. CDE responded on March 17, 2025, that CIF should continue to comply with California Education Code § 221.5(f). *Id.* ¶ 51.[4]

**E. The Complaint's Allegations and OCR's Investigations**

The Complaint alleges that California's policies deny girls equal athletic opportunities by allowing students to compete on teams consistent with their gender identity when that identity does not align with their biological sex. To illustrate the alleged effects of those policies, Plaintiff identifies five students whom it alleges are male and who participated on girls' teams in track and field, cross-country, volleyball, basketball, and soccer between 2021 and 2025. Doc. # 1 ¶¶ 65–85. Plaintiff alleges that some of these students won individual events or competed on championship teams, displacing girls or otherwise reducing their athletic opportunities. *Id.*

The Complaint also describes a pilot process CIF adopted for the May 2025 State Track and Field Championships. Under that process, an additional "biological female student-athlete" could advance to the finals or receive a medal when another athlete's placement otherwise prevented her from qualifying or earning that placement. *Id.* ¶¶ 57–63. Plaintiff alleges that CIF adopted the process in response to the participation of a student Plaintiff identifies as male. *Id.* Plaintiff further contends that, by adopting the process, CIF recognized the policy's effects on girls' competitive opportunities but did not adequately remedy them. *Id.*

Plaintiff further alleges that California's policies affect girls outside athletic competition. According to the Complaint, allowing students to use facilities consistent with their gender identity requires girls to share locker rooms and other intimate spaces with students Plaintiff classifies as male. *Id.* ¶¶ 45, 54–55, 86–89. Plaintiff also alleges

[4] Defendants state, and Plaintiff does not dispute, that before 2025, neither the Department of Education nor another federal agency had taken enforcement action treating § 221.5(f)'s participation requirements as inconsistent with Title IX. Doc. # 25-1 at 10, 27–28; Doc. # 29 at 21 n.8. Defendants also state, and Plaintiff does not dispute, that the Department of Education did not use notice-and-comment rulemaking to amend the regulations after the Executive Orders. Doc. # 29 at 9.

that the policies reduce girls' opportunities for athletic recognition, college recruiting, and scholarships. *Id.* ¶¶ 90–95.[5]

The Complaint alleges that the Department of Education opened Title IX investigations of CIF in February 2025 and CDE in April 2025. Doc. # 1 ¶¶ 98–99. On June 25, 2025, the Department of Education informed Defendants that it had found them noncompliant with Title IX, provided a proposed voluntary resolution agreement, and advised that, absent an agreement, it could initiate enforcement proceedings or refer the matter to the Department of Justice. *Id.* ¶¶ 100–01. Defendants declined to enter into the resolution agreement on July 7, 2025, and the Department of Education referred its findings to the Department of Justice for enforcement. *Id.* ¶¶ 102–04. Plaintiff filed this action two days later. Doc. # 1.

## III. LEGAL STANDARD

Rule 12(b)(6) permits dismissal for failure to state a claim. Fed R. Civ. P. 12(b)(6). Dismissal is proper when a complaint lacks a cognizable legal theory or sufficient facts to support one. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

A complaint must contain enough factual matter, accepted as true, to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court draws reasonable inferences in the plaintiff's favor, but it need not accept legal conclusions or a formulaic recitation of a claim's elements. *Id.* at 678–79; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Court generally confines its review to the complaint, documents incorporated by reference, and matters properly subject to judicial notice. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018). The Court considers the public statutes, regulations, Executive Orders, Federal Register materials, and judicial

---

[5] The Complaint also describes an incident in which two students were required to remove or cover shirts with a message protesting Defendants' policy. Doc. # 1 ¶ 97. Plaintiff clarifies that these allegations provide context and do not assert a separate retaliation claim. Doc. # 27 at 27–28 n.9.

decisions cited herein for their contents and legal effect, not for the truth of disputed factual assertions.

Leave to amend should ordinarily be granted unless amendment would be futile, unduly prejudicial, or otherwise improper. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Futility alone may justify denial of leave. *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 814–15 (9th Cir. 2020).

## IV. DISCUSSION

### A. *West Virginia* Frames the Court's Analysis

On June 30, 2026, the Supreme Court decided two consolidated cases in *West Virginia v. B. P. J.*, 146 S. Ct. 2356 (2026). The Court held that Title IX permits schools to determine eligibility for girls' and women's teams based on biological sex. *Id.* at 2370–73. The Court repeatedly framed that holding in permissive terms. It explained that Title IX's regulations "expressly *permit* schools" to maintain separate sex-based teams and ultimately held that States "*may* maintain women's and girls' sports for biological females" and "*may* determine eligibility" for those teams based on biological sex. *Id.* at 2371, 2375 (emphasis added). The Court thus upheld the biological-sex eligibility rules before it without holding that Title IX requires every school to adopt the same rule.

The Court also declined to decide whether Title IX permits transgender girls to participate on girls' and women's teams. *Id.* at 2367 n.1. It expressly stated that nothing in the opinion was intended to decide that "distinct question," because it was not at issue. *Id.*[6]

[6] The Court's equal protection analysis likewise emphasized the institutional limits of judicially administered eligibility rules. It explained that assessing the effects of puberty blockers or hormones on individual transgender athletes, and comparing their athletic abilities with those of other athletes, would be "an almost impossible task for a judge to perform on an equitable basis." *Id.* at 2378. The Court concluded that legislatures and schools are "better equipped" to assess the competing medical and scientific considerations and "draw appropriate lines." *Id.* That reasoning further counsels against deciding the question *West Virginia* expressly left open when this case can be resolved on the narrower Spending Clause ground.

That reserved question need not be resolved here. Plaintiff seeks to enforce a categorical exclusion rule as a condition of federal funding. The Spending Clause inquiry is therefore whether Title IX and its implementing regulations clearly required California to exclude transgender girls from girls' teams and sex-separated facilities. As explained below, they did not.

**B. The Spending Clause Bars Plaintiff's Title IX Theory**

Title IX is Spending Clause legislation. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). For Spending Clause legislation, when Congress conditions federal funds on compliance with specified requirements, it must provide recipients with "clear notice" of those conditions so they can make an informed choice whether to accept the funds and the accompanying obligations. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 24–25 (1981) (requiring Congress to speak "unambiguously" and asking whether it "spoke so clearly" that the State could "make an informed choice" before accepting the funds); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (asking whether the statute "furnishes clear notice" of the asserted obligation and whether a state official deciding whether to accept federal funds "would clearly understand" that obligation). A recipient therefore is bound only by conditions it accepts "voluntarily and knowingly." *See Pennhurst*, 451 U.S. at 17. The Supreme Court recently reiterated that Congress must "clearly and unambiguously" alert a grant recipient to any condition attached to federal funds. *Landor v. La. Dept. of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026).[7]

The Ninth Circuit applied these principles to Title IX in *Roe v. Critchfield*, 137 F.4th 912 (9th Cir. 2025). There, transgender students asserted that Title IX required

[7] Congress's constitutional authority over federal funds has deep historical roots. By the Constitutional Convention, it was "uncontroversial" that the powers to raise and disburse public money would reside in the Legislative Branch. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 428–31 (2024). Consistent with that history, the Ninth Circuit has explained that the Constitution "exclusively grants the power of the purse to Congress, not the President," and that Congress's spending power includes authority to impose conditions on federal grants. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231–32 (9th Cir. 2018).

access to school facilities corresponding to their gender identity. Rather than resolve that broader question, the Ninth Circuit held that the recipients lacked clear notice of the asserted obligation. *Id.* at 926–31. The court also rejected the argument that the clear-notice rule applies only to retrospective monetary relief, explaining that *Pennhurst* itself involved an injunction. *Id.* at 930 & n.12. The same clear-notice requirement therefore governs the prospective relief Plaintiff seeks here.[8]

1. <u>Defendants Did Not Receive Clear Notice of the Condition Plaintiff Seeks to Enforce</u>

The Complaint asks the Court to order Defendants to issue statewide directives "prohibiting the participation of males in athletic competitions designated for females." Doc. # 1 ¶ 117(c)(1). It also treats access to girls' locker rooms and other sex-separated facilities as governed by the same biological-sex classification. *Id.* ¶¶ 5, 45, 54–55, 86–89. The asserted condition is therefore categorical: whenever a recipient provides girls' teams or female facilities, biological sex must control participation and access regardless of gender identity.

Plaintiff's reliance on Section 106.41(c) rests on that premise. Plaintiff argues that a girls' team becomes, at best, coeducational when a transgender girl participates and that the resulting program denies girls equal athletic opportunity. Doc. # 27 at 27–28.[9] The Court considers that argument together with the statute and the regulatory scheme as a whole.

---

[8] The clear-notice requirement is not limited to private enforcement. In *Bennett v. Kentucky Dept. of Educ.*, the Secretary of Education sought repayment of allegedly misused federal education funds, and the Supreme Court applied *Pennhurst* in determining whether Kentucky had knowingly accepted the obligation the Secretary sought to enforce. 470 U.S. 656, 665–70 (1985). Justice Gorsuch likewise applied the clear-notice principle directly to Title IX athletics in his *West Virginia* concurrence, concluding that Title IX did not clearly and unambiguously inform funding recipients that they were prohibited from limiting girls' teams to biological females. *West Virginia*, 146 S. Ct. at 2382–84 (Gorsuch, J., concurring). Plaintiff seeks to enforce the converse rule here: that Title IX requires recipients to exclude students classified as male based on biological sex from girls' teams regardless of gender identity. That asserted condition must satisfy the same clear-notice requirement.

[9] All record citations reflect CM/ECF pagination.

### *a. Title IX and its Implementing Regulations Do Not Clearly State Plaintiff's Categorical Rule*

In deciding whether Spending Clause legislation clearly communicates a funding condition, courts begin with the governing statutory text and consider any implementing regulations that bear on the recipient's obligations. *See Arlington*, 548 U.S. at 296 (beginning the clear-notice inquiry with the statutory text); *Critchfield*, 137 F.4th at 928–31 (applying the clear-notice rule by examining Title IX together with its implementing regulations).[10]

Title IX prohibits discrimination on the basis of sex, and *West Virginia* establishes that "sex" in this context means biological sex. 20 U.S.C. § 1681(a); *West Virginia*, 146 S. Ct. at 2370–72. Title IX does not address eligibility requirements for sports programs or access to athletics facilities—indeed it does not address athletics at all. *See generally id.* §§ 1681–1688; *see also*, *West Virginia*, 146 S. Ct. at 2370 (noting that as originally enacted, Title IX "did not explicitly address sports."). It also does not state that the participation of a transgender girl on a girls' team, or a transgender girl's use of a girls' facility, necessarily constitutes discrimination against other students on the basis of sex.

Congress addressed athletics through the Javits Amendment by directing the agency to issue reasonable provisions that account for the nature of particular sports. Pub. L. No. 93-380, § 844, 88 Stat. 612. Congress did not prescribe eligibility rules for transgender athletes. The regulation it directed likewise stops short of Plaintiff's rule.

Section 106.41(a) states the general nondiscrimination command for athletics. Section 106.41(b) then authorizes separate teams for members of each sex when selection is based on competitive skill or the sport involves contact. 34 C.F.R. §

[10] This textual focus accords with the contract analogy that informs Spending Clause doctrine. *See Landor*, 146 S. Ct. at 1940–42. *Landor* explained that the analogy helps determine whether a recipient knowingly and voluntarily accepted the terms attached to federal funds and, consistent with that principle, requires Congress to "clearly and unambiguously alert a grant recipient to any condition on federal funds." *Id.*

106.41(a)–(b). After *West Virginia*, the authorization plainly permits a school to limit a girls' team to biological females.

The text does not require every recipient to adopt that approach, however. Section 106.41(b) distinguishes between what recipients may do and what they must do. It provides that recipients "*may* operate or sponsor separate teams for members of each sex" in specified circumstances, but when it imposes a participation requirement, it uses mandatory language: members of an excluded sex "*must* be allowed to try-out" in specified circumstances. 34 C.F.R. § 106.41(b) (emphasis added). The regulation contains no comparable command requiring recipients to exclude transgender girls from girls' teams based on biological sex. *See Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162, 171–72 (2016) (contrasting mandatory and discretionary statutory language).

Section 106.41(c) requires equal athletic opportunity and identifies factors bearing on that inquiry. Those factors include effective accommodation, equipment, scheduling, travel, coaching, facilities, medical services, housing, publicity, and support services. 34 C.F.R. § 106.41(c). Neither the general requirement nor the listed factors state that a transgender girl's participation necessarily converts a girls' team into a coeducational team. Nor do they make such participation, by itself, a per se denial of equal athletic opportunity for girls.

The Complaint's accommodation and equal-treatment allegations depend on the same unstated rule. It identifies athletic results and asserts that transgender participation reduces girls' opportunities. Doc. # 1 ¶¶ 57–95. The Complaint does not allege a distinct violation that can be separated from the proposition that transgender girls must be excluded from girls' teams as a class. Section 106.41(c) cannot supply clear notice of that proposition when the regulation never states it.

The facilities regulation follows the same pattern. Section 106.33 permits recipients to provide separate toilet, locker-room, and shower facilities on the basis of sex, provided that the facilities are comparable. 34 C.F.R. § 106.33. It does not require

access to be determined exclusively by biological sex in every circumstance. Binding Ninth Circuit precedent had already rejected the argument that Title IX's authorization of sex-separated facilities necessarily requires biological-sex-only access. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227–29 (9th Cir. 2020) (rejecting a Title IX challenge to a policy permitting access based on gender identity and explaining that sex-separated facilities need not "be segregated based only on biological sex").

Section 106.6 does not supply the missing substantive requirement. It provides that state law or an athletic association's rule cannot excuse a recipient from complying with Title IX. 34 C.F.R. § 106.6(b)–(c). But that principle applies only after the Court determines what Title IX requires. Section 106.6 does not itself establish that California's policy conflicts with Title IX or define the eligibility rule Plaintiff seeks to enforce.

Read together, Title IX, the Javits Amendment, Section 106.41, and Section 106.33 permit biological-sex separation and require equal treatment. They do not clearly communicate Plaintiff's further condition that biological sex must control every eligibility and facilities decision regardless of gender identity.

#### ***b. Judicial Decisions Did Not Supply the Missing Clarity***

Judicial decisions can help determine what a recipient reasonably would have understood a funding condition to require. In *Jackson v. Birmingham Bd. of Educ.*, the Supreme Court relied in part on uniform appellate authority, longstanding regulations, and prior decisions when it held that Title IX clearly prohibited retaliation. 544 U.S. 167, 182–84 (2005). A conflict among courts does not by itself defeat clear notice in all instances, however. *Davis*, for example, found adequate notice despite disagreement over liability for severe student-on-student sexual harassment. 526 U.S. at 649–50. The text and regulations remain the starting point of the Spending Clause "clear notice" analysis.

As discussed above, the statutory and regulatory text did not state the asserted rule. *See supra* Section IV.B.1(a). To the extent that binding precedent could provide

notice in the absence of clear direction from Congress, it did not. *Parents for Privacy* held that Title IX did not prohibit a school from allowing transgender students to use facilities consistent with gender identity. 949 F.3d at 1227–29. *Critchfield* later held that Title IX did not clearly require the opposite rule. 137 F.4th at 927–31. Taken together, those decisions did not give California clear notice that Title IX required facilities access to be determined exclusively by biological sex. *See also State of Minnesota v. Trump*, No. 25-cv-1608 (ECT/DLM), 2026 WL 2295012, at *15 (D. Minn. Aug. 10, 2026) (explaining that even if Title IX prohibits transgender girls from participating on girls' teams or using girls' facilities, that would not establish that Minnesota had clear notice of the prohibition when it accepted federal funds).

Other Ninth Circuit decisions likewise did not signal that Title IX required categorical exclusion based on biological sex. In *Doe v. Snyder*, the Ninth Circuit, while declining to reach the merits, rejected the premise that *Bostock*'s reasoning—that it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex—was necessarily limited to Title VII, noting the similar prohibitions against sex discrimination in Titles VII and IX. 28 F.4th 103, 113–14 (9th Cir. 2022) (citing *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020)). And in *Grabowski v. Ariz. Bd. of Regents*, the Ninth Circuit held that discrimination based on actual or perceived sexual orientation constitutes discrimination on the basis of sex under Title IX. 69 F.4th 1110, 1116–18 (9th Cir. 2023). Neither case involved athletic eligibility or established that California's policy complied with Title IX. But neither would have alerted California that Title IX unmistakably required the categorical exclusion Plaintiff now seeks.

The national case law was similarly unsettled. In 2024, the Fourth Circuit held that a biological-sex eligibility law violated Title IX as applied to a transgender girl who had taken puberty blockers and hormones. *B. P. J. v. West Va. State Bd. of Educ.*, 98 F.4th 542, 563–65 (4th Cir. 2024), *rev'd sub nom. West Virginia v. B. P. J.*, 146 S. Ct. 2356 (2026). *West Virginia* now controls and establishes that biological-sex eligibility

is permissible. The Fourth Circuit's earlier holding is no longer in force, but the fact that a published court of appeals decision had read Title IX to *require* the inclusion of a transgender athlete on a girls' team strongly suggests Defendants could not have had clear notice that Title IX required the opposite.

In April 2026, the Eighth Circuit described "whether Title IX requires, permits, or prohibits" transgender participation in female athletics as an "open question of law." *Female Athletes United v. Ellison*, 172 F.4th 1019, 1029 (8th Cir. 2026). The court also observed that, under the prior Administration's interpretation of Title IX, the defendants there had "good reason to believe" that excluding a transgender girl from girls' softball would itself have constituted sex discrimination. *Id.* at 1029 n.7. *West Virginia* later resolved part of that uncertainty by holding that Title IX permits schools to determine eligibility for girls' and women's teams based on biological sex. 146 S. Ct. at 2371–73. But, as noted above, the Supreme Court expressly reserved the "distinct question" of whether schools may allow transgender girls to participate on those teams. *Id.* at 2367 n.1.

Plaintiff emphasizes that *Ellison* arose in a private enforcement action and ultimately affirmed on the ground that the plaintiff lacked a private right of action for the Title IX claims it asserted. Doc. # 44 at 5–6; *Ellison*, 172 F.4th at 1027–30. That procedural distinction does not affect the narrower point relevant here. In describing the legal landscape before *West Virginia*, the Eighth Circuit expressly recognized both that the athletics question remained unsettled and that successive administrations had taken materially different positions on it. *See Ellison*, 172 F.4th at 1029 & n.7.

Plaintiff also points to litigation over the Department of Education's 2024 Title IX regulations. Those regulations generally defined sex discrimination to include discrimination based on gender identity, but they did not resolve eligibility for sex-separated athletic teams; the Department expressly left that subject to a separate rulemaking. 89 Fed. Reg. 33474, 33817, 33886 (Apr. 29, 2024). Several courts enjoined enforcement of provisions of the regulations, and the Supreme Court later observed that

all Members of the Court agreed the plaintiffs were entitled to preliminary relief against, among other provisions, the regulation's central definition of sex discrimination. *See Louisiana*, 603 U.S. at 867. Those rulings, however, did not hold that Title IX's preexisting statute and athletics regulations already required schools to exclude transgender girls from girls' teams or sex-separated facilities. And *West Virginia* later expressly reserved whether Title IX permits schools to allow transgender girls to participate on girls' teams. 146 S. Ct. at 2367 n.1.

Court decisions therefore did not cure the lack of clarity in the statute and regulations. No settled body of authority informed California that accepting federal funds required the statewide rule Plaintiff now seeks to enforce.

#### *c. Conflicting Executive Branch Interpretations Did Not Provide Clear Notice*

Executive Branch interpretations may bear on the clear-notice inquiry because contemporaneous agency materials can inform what a funding recipient would have understood federal law to require.[11] But later interpretations cannot retroactively supply notice of a new condition for funds already accepted. *See Pennhurst*, 451 U.S. at 25 (1981) (rejecting "post acceptance or 'retroactive' conditions"); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1174–75 (9th Cir. 2019) (same). And *Critchfield* expressly left open whether Executive Orders may provide prospective notice of a Title IX obligation. 137 F.4th at 931 n.16. The Executive Branch's interpretations are therefore relevant to the notice history, but their timing and consistency matter.[12]

---

[11] *See Bennett v. Kentucky Department of Education*, 470 U.S. 656, 669–70 (1985) (considering regulations and administrative interpretations in determining the obligations attached to federal education funds); *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 647–48 (1999) (explaining that later-issued OCR guidance came "too late to contribute to" a recipient's notice).

[12] Courts have likewise treated inconsistent or newly announced agency positions as evidence against clear notice. *See, e.g.*, *Oakley v. DeVos*, No. 20-cv-03215-YGR, 2020 WL 3268661, at *12 n.19 (N.D. Cal. June 17, 2020) (treating the Department of Education's reversal of its stated grant-eligibility position as further support for a Spending Clause claim); *see also Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 568 & n.8 (4th Cir. 1997) (Luttig, J., dissenting) (reasoning that the asserted funding

In 2015, the Department of Education stated that schools generally must treat transgender students consistent with their gender identity in sex-separated settings. *See* Letter from James A. Ferg-Cadima, Acting Deputy Assistant Sec'y for Policy, Off. for C.R., U.S. Dep't of Educ., to Emily T. Prince 2 (Jan. 7, 2015). The Departments of Education and Justice adopted the same position in joint guidance the following year. *See* U.S. Dep'ts of Educ. & Just., *Dear Colleague Letter on Transgender Students* 2–3 (May 13, 2016). That guidance addressed athletics but permitted "age-appropriate, tailored requirements based on sound, current, and research-based medical knowledge" concerning competitive fairness or physical safety. *Id.* at 3. The Departments withdrew both documents in 2017 to "further and more completely consider the legal issues involved." U.S. Dep'ts of Educ. & Just., *Dear Colleague Letter* 1–2 (Feb. 22, 2017).

The Executive Branch changed course again in 2021. On January 8, the Department of Education's Office of General Counsel interpreted § 106.41(b) to require athletic teams separated by sex to be organized according to biological sex. U.S. Dep't of Educ., Off. of Gen. Couns., *Memorandum re Bostock v. Clayton County* 6–8 (Jan. 8, 2021). Twelve days later, Executive Order 13988 directed federal agencies to treat discrimination based on gender identity as a form of sex discrimination under statutes including Title IX, absent sufficient indications to the contrary. Exec. Order No. 13988, 86 Fed. Reg. 7023, 7023–24 (Jan. 20, 2021).

In 2023, the Department of Education proposed an athletics rule while acknowledging that the existing regulations were "not sufficiently clear" on sex-related eligibility criteria. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22860, 22866 (Apr. 13, 2023). The Department withdrew that proposal in December 2024 without adopting a final standard. 89 Fed. Reg. 104936, 104937 (Dec. 26, 2024).

---

condition lacked clear notice because the Department adopted its interpretation years after enactment, described it as a "new condition," and enforced it "neither uniform[ly] nor constant[ly]") (emphasis omitted).

The Executive Branch changed course yet again in 2025. Executive Order 14168 (the "January 2025 Executive Order") and Executive Order 14201 (the "February 2025 Executive Order") adopted a biological-sex-based enforcement position, including for Title IX athletics. *See* Exec. Order No. 14168, 90 Fed. Reg. 8615, 8615–18 (Jan. 30, 2025); Exec. Order No. 14201, 90 Fed. Reg. 9279, 9279–80 (Feb. 11, 2025). Section 1682 assigns implementation of Title IX to the federal departments and agencies extending financial assistance, authorizing them to act through "rules, regulations, or orders of general applicability." 20 U.S.C. § 1682. The February 2025 Executive Order, in turn, directed the Secretary of Education to "take all appropriate action" and to "bring regulations and policy guidance into line" with the President's policy. 90 Fed. Reg. at 9279–80. Thus, even assuming an Executive Order may provide prospective notice in some circumstances, the February 2025 Executive Order itself contemplated further agency action to implement its Title IX athletics policy.[13]

This history confirms that Title IX and its implementing regulations did not provide clear notice of Plaintiff's asserted funding condition. Federal officials repeatedly gave materially different answers to how Title IX applies to transgender students, and in 2023 the Department itself acknowledged that the existing athletics regulations were "not sufficiently clear" on eligibility criteria. 88 Fed. Reg. at 22866, 22879. The January and February 2025 Executive Orders announced the current Administration's interpretation, but they could not retroactively cure that lack of notice for funds already accepted. *See Pennhurst*, 451 U.S. at 25; *City of Los Angeles*, 929 F.3d at 1174–75.

[13] The Court does not infer a lack of clear notice from any absence of earlier federal enforcement. Agency nonenforcement may reflect resource constraints, enforcement priorities, or other considerations unrelated to the agency's view of the law. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The Court instead relies on the affirmative federal interpretations described above.

2. <u>CDE's Certification and Later Drawdowns Do Not Establish Clear Notice</u>

Plaintiff separately argues that CDE's own conduct shows notice and acceptance of the asserted condition. It points to CDE's November 2024 Grant Certification and contends that CDE later continued to draw federal funds with notice of the 2025 Executive Orders. Doc. # 1 ¶¶ 37–38; Doc. # 27 at 30, 32. But a recipient's conduct cannot supply clarity that the funding condition itself lacks. *See Pennhurst*, 451 U.S. at 17 (explaining that there can be "no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it").[14] As explained above, Title IX and its regulations did not clearly impose Plaintiff's categorical eligibility and facilities rule. *See supra* Section IV.B.1(a).

The November 2024 Certification does not change that conclusion. Title IX's assurance regulation requires applicants for federal financial assistance to assure that covered programs will comply with Title IX's regulations. 34 C.F.R. § 106.4(a). The Department of Education's general grant-compliance regulation likewise requires grantees to comply with applicable statutes, regulations, Executive orders, stated institutional policies, and applications. *Id.* § 75.700. CDE's Certification similarly states that it "[w]ill comply with all applicable requirements" governing federal financial assistance, including Title IX. Doc. # 1 ¶ 38. These are general promises to comply with applicable requirements; they do not define the disputed eligibility or facilities rule. Nor does the Certification show that CDE accepted the interpretation later announced in the January and February 2025 Executive Orders, which did not yet exist when CDE signed it. *See Pennhurst*, 451 U.S. at 25 (explaining that the Spending Clause does not permit "post acceptance or 'retroactive' conditions"); *City of Los Angeles*, 929 F.3d at 1174–75 (applying *Pennhurst* to reject "post acceptance or 'retroactive' conditions").

[14] Recipient conduct can demonstrate acceptance when the condition itself has been clearly stated. *See, e.g.*, *Douglas v. Cal. Dept. of Youth Auth.*, 271 F.3d 812, 820–21 (9th Cir. 2001) (holding that California waived sovereign immunity by accepting Rehabilitation Act funds where federal law clearly conditioned receipt of those funds on waiver).

Plaintiff further argues that CDE's continued drawdowns after the 2025 Executive Orders show that CDE accepted federal funds with notice of the asserted condition. Doc. # 27 at 30, 32. The Court need not decide whether CDE had actual knowledge of the Orders when it drew those funds or whether each drawdown constituted a new acceptance of federal funding. Even assuming both propositions, CDE's conduct would show acceptance of funds with knowledge of the Administration's interpretation. It would not establish that the interpretation was a clearly stated condition of those funds. For the reasons explained above, it was not. *See supra* Section IV.B.1(c). CDE's Certification and alleged later drawdowns therefore do not establish the clear notice required by the Spending Clause.

***

Count I depends on a single asserted rule: that Title IX requires schools to use biological sex, regardless of gender identity, to determine eligibility for girls' athletics and access to sex-separated athletic facilities. Plaintiff's athletics, equal-opportunity, and facilities theories all depend on that rule. Because Title IX and its regulations did not clearly impose any such rule as a condition of federal funding, Count I is dismissed.

**C. *Count II Fails for the Same Reason as Count I***

Count II alleges that CDE agreed to comply with Title IX and its implementing regulations and materially breached that agreement through the Title IX violations alleged in Count I. Doc. # 1 ¶¶ 112–16. The contractual claim therefore depends on the same substantive obligation to restrict girls' sports teams and facilities by biological sex without consideration of gender identity.

As explained above, Title IX and its regulations did not clearly condition federal funding on the categorical athletics and facilities rule alleged in the Complaint. An assurance to comply with Title IX cannot supply a term Title IX, its implementing regulations, or then-existing caselaw did not clearly impose. Because Plaintiff has not pleaded the underlying Title IX breach, Count II is dismissed.

**D. Amendment Would Be Futile**

A court may deny leave to amend when amendment would be futile. *Foman*, 371 U.S. at 182. Amendment is futile when additional allegations could not cure the legal defect. *Kroessler*, 977 F.3d at 814–15.

The defect here is legal. The Complaint already alleges CDE's funding and Certification, the Executive Orders, the athlete examples, the facilities allegations, and the asserted harms. Additional detail about those subjects would not alter Title IX's text, the governing regulations, *West Virginia*'s reservation, or the Spending Clause's clear-notice requirement.

Because no amendment could supply the missing funding condition, Counts I and II are dismissed with prejudice and without leave to amend.

## V. <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED. The Complaint is DISMISSED WITH PREJUDICE and without leave to amend.

All pending matters are hereby TERMINATED. The Clerk is directed to close the case.

**IT IS SO ORDERED.**

Dated: August 31, 2026

Cynthia Valenzuela

HON. CYNTHIA VALENZUELA
UNITED STATES DISTRICT JUDGE